IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FREDERICK E. HOFER,

                    Plaintiff,                    OPINION AND ORDER

    v.
                                            08-cv-321-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an action for judicial review of a partially adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Plaintiff Frederick E. Hofer seeks reversal of the commissioner's determination that he was not disabled before his fifty-fifth birthday and therefore ineligible for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act, codified at 42 U.S.C. §§ 416(i), 423(d) and 1382(c)(3)(A). Plaintiff contends that the administrative law judge failed to consider all of his limitations in assessing his residual functional capacity, made an improper credibility determination and relied on erroneous vocational expert testimony at step five. I find that the administrative law judge properly considered all of plaintiff's limitations in making his residual functional capacity assessment,

1

made a reasonable credibility determination and fulfilled his responsibility under the regulations at step five. For these reasons, I am denying plaintiff's motion for summary judgment and affirming the administrative law judge's decision.

The following facts are drawn from the administrative record (AR):

## FACTS

A. Background and Procedural History

Plaintiff was born on August 29, 1952. AR 88. He completed high school, AR 100, and has worked as a carpenter, farm laborer, machinist and maintenance worker, AR 97.

Plaintiff applied for disability insurance benefits and supplemental security income in August 2005, alleging disability since September 20, 2004 because of chronic obstructive pulmonary disease. AR 88, 95, 467. After the local disability agency denied his application initially and upon reconsideration, plaintiff requested a hearing, which was held on September 18, 2007 before Administrative Law Judge John H. Pleuss in Madison, Wisconsin. The administrative law judge heard testimony from plaintiff, AR 43-65, and from a neutral vocational expert, AR 65-71. On September 21, 2007, the administrative law judge issued a partially favorable decision, finding plaintiff disabled as of August 29, 2007, his fifty-fifth birthday, but not before. AR 16-26. Because plaintiff's eligibility for Disability Insurance Benefits had expired on December 31, 2006, the administrative law

judge denied that application, but he granted plaintiff's application for Supplemental Security Income beginning August 29, 2007.  This decision became the final decision of the commissioner on November 30, 2007, when the Appeals Council denied plaintiff's request for review.  AR 8-10.  Plaintiff challenges the unfavorable portion of the decision.

B. <u>Medical Evidence</u>

On April 18, 2005, plaintiff went to the urgent care clinic at the Madison Veterans Administration Hospital, complaining of shortness of breath.  He was diagnosed with exacerbation of probable chronic obstructive pulmonary disease and was prescribed Combivent and Albuterol inhalers.  AR 251-52.

On April 19, 2005, plaintiff was admitted to the hospital to further manage his chronic obstructive pulmonary disease.  He was given prednisone.  AR 164-65.  On April 21, 2005, a respiratory therapist saw plaintiff in his hospital room.  The therapist removed plaintiff's oxygen for 15 minutes and noted that his oxygen level was 90 to 92 percent. Plaintiff walked unaided in the hallway without oxygen for six minutes (about 600 feet).  His average oxygen level was 89 percent.  The therapist noted that although plaintiff would qualify for oxygen with exertion, he was not willing to use portable oxygen for that purpose. AR 221-22.  When plaintiff was discharged on April 22, 2005, he was breathing more easily

3

and not in distress.  AR 164.  Plaintiff was encouraged to stop smoking and given medication to assist him.  AR 165.

On May 10, 2005, plaintiff saw Dr. Carrie Chapman in the outpatient clinic and reported that his breathing had improved.  A May 10, 2005 spirometry (lung function) test revealed moderate obstruction that met the criteria for improvement with bronchodilators.  AR 205-11.  Dr. Lyn Thet indicated that this pattern would be most consistent with obstructive lung disease, such as asthma or chronic obstructive pulmonary disease (emphysema or chronic bronchitis).  AR 174.

On May 23, 2005, plaintiff saw Dr. Chapman and reported that he was working five hours a day but that in the last two days, he had been increasingly short of breath.  Dr. Chapman indicated that plaintiff had mild exacerbation of his chronic obstructive pulmonary disease.  She prescribed a two-week course of steroids.  AR 201-03.

On June 21, 2005, plaintiff went to the outpatient clinic and reported increased breathing difficulties, including shortness of breath when walking from the front door to the clinic entrance.  The doctor noted that plaintiff seemed particularly responsive to prednisone and had had marked improvement with it in the recent past.  The treatment note indicated that plaintiff might have bacterial exacerbation of his bronchitis, accounting for the persistence and refractory nature of his symptoms.  AR 195-97.

On July 12, 2005, plaintiff again saw Dr. Chapman, who reported that he was doing well without further exacerbation after not taking prednisone for one week. She also noted that plaintiff had stopped smoking. Plaintiff indicated that he still could not work a full day. AR 193-94.

On August 8, 2005, plaintiff visited the outpatient clinic with complaints of increased breathing problems. He also reported feeling dizzy when he stood up too fast. A chest x-ray showed a lung collapse in his left lower lobe. The doctor diagnosed plaintiff as having an exacerbation of chronic obstructive pulmonary disease and prescribed prednisone. AR 184-87. On August 30, 2005, plaintiff saw Dr. Chapman for follow-up. She noted that plaintiff had responded well to prednisone therapy but was able to work only part-time because of his breathing difficulty. Plaintiff said that he had applied for social security benefits. Dr. Chapman encouraged plaintiff to abstain from smoking. AR 180-82.

On October 14, 2005, plaintiff went to urgent care, complaining of shortness of breath and dizzy spells with too much activity. Dr. Chapman prescribed another burst of prednisone. AR 313-16. On November 1, 2005, plaintiff saw Dr. Thomas Teelin at the pulmonary clinic. He reported that his exercise tolerance waxed and waned and that he had had an episode of vertigo recently after applying gutters to his house. Plaintiff also reported that he found it difficult to walk into the clinic from the parking lot. Plaintiff completed a six-minute walk test, which was unremarkable. Dr. Teelin noted that plaintiff was breathing

5

comfortably without wheezing or rales.  Because his oxygen level was 97 percent at rest and 91 percent or higher while walking, he did not meet the Medicare requirements for home oxygen.  Dr. Teelin diagnosed plaintiff with significant obstructive pulmonary disease with reversibility after bronchodilators and prescribed Advair.  AR 300-03.

On November 22, 2005, plaintiff saw Dr. Chapman and reported that since taking the Advair, he felt better.  He complained of bilateral wrist weakness and reported difficulty chopping wood because of wrist pain.  Upon examination, Dr. Chapman noted that plaintiff had normal wrist strength, sensation and range of motion.  Plaintiff reported that he was not able to exercise because of shortness of breath.  He asked Dr. Chapman to complete forms for his application for disability benefits.  AR 307-08.

In a Pulmonary Impairment Medical Assessment Form dated November 22, 2005, Dr. Chapman noted that she had treated plaintiff for chronic obstructive pulmonary disease and hypertension beginning in April 2005.  She indicated that plaintiff had asthma attacks monthly that incapacitated him for a week, that these attacks interfered with his attention and concentration to perform even simple work tasks several times a week and that plaintiff could walk one to two city blocks without rest or shortness of breath.  Dr. Chapman did not answer the questions about plaintiff's exertional capacity but found that he should avoid all exposure to extreme cold and heat, high humidity, chemicals, solvents and cleaners, soldering fluxes, cigarette smoke, perfumes, fumes, odors, dusts and gases.  She concluded that plaintiff

6

would likely be absent from work more than four days a month and that his impairment could be expected to last at least twelve months. AR 270-73.

On January 10, 2006, plaintiff completed a walking test. He walked six minutes for about 850 feet with his oxygen saturation level remaining at 97% or higher. He had noticeable shortness of breath and was instructed to breathe through his pursed lips. AR 465. An x-ray of plaintiff's lungs showed a "clearing of the previously noted linear opacity at the left lung base." AR 373. Plaintiff also reported that he had low back pain from moving logs. AR 461. Two days later, plaintiff was seen in the pulmonary clinic. The doctor noted that plaintiff had moderate to severe chronic obstructive pulmonary disease with airway hyper-reactivity but that his wheezing and coughing had improved on Advair and Combivent. The doctor instructed plaintiff to increase his activity level. AR 462.

Also on January 12, 2006, Dr. Chapman saw plaintiff for pain in his wrists. She noted that he presented with symptoms consistent with carpal tunnel syndrome and provided him with wrist splints. Dr. Chapman indicated that plaintiff had normal grip strength. AR 464. On January 24, 2006, plaintiff reported to Dr. Chapman that he had not had any recent exacerbations of his chronic obstructive pulmonary disease but that increasing his activity level was not realistic. Dr. Chapman told plaintiff that she agreed with the pulmonary doctor that any amount of exercise would help plaintiff's lungs, weight and high blood pressure. She noted that although plaintiff's wrists were minimally tender, he had

7

normal range of motion and strength.  AR 459.  X-rays of plaintiff's wrists revealed post surgical changes of proximal row carpectomy and degenerative changes throughout the carpal bones.  AR 370-71.

On February 23, 2006, plaintiff went to the outpatient clinic, reporting pain in his right wrist after banging it the week before.  He heard a crack at the time and was experiencing tingling and numbness in the tips of his first and second fingers.  Plaintiff reported that he had no current wrist pain and was taking eight to ten Tylenol pills daily for discomfort.  AR 454.  The doctor indicated that plaintiff had normal range of motion, normal strength and normal sensation in his wrists.  AR 455-56.

On March 13, 2006, Dr. Donald Hayes performed a pulmonary function test on plaintiff because his shortness of breath was out of proportion to his disease and past pulmonary function test.  Dr. Hayes reported that plaintiff had an oxygen saturation of 97 percent or greater throughout the testing and a low maximum oxygen consumption during incremental exercise.  In his opinion, plaintiff's low oxygen consumption did not appear to be related to lung disease but might be a component of deconditioning.  He also noted that heart disease might be a contributing factor.  AR 451-52.  An April 18, 2006 chest x-ray showed new collapse of lung tissue in the left mid to lower lung field or scarring but no pleural effusions.  AR 370.

On May 23, 2006, Dr. Chapman examined plaintiff and noted that he was doing well and had not had recent flares of his chronic obstructive pulmonary disease.  She indicated that he had pain in his wrists for which he took Tylenol Arthritis.  AR 446.  Plaintiff reported that he had had a functional test performed in Milwaukee that indicated he could do light work in a seated position.  AR 447.  Although plaintiff reported feeling depressed, Dr. Chapman did not diagnose him with depression.  AR 448.

On June 27, 2006, plaintiff saw Dr. Jerome Ebert for an orthopedic consultation concerning the daily pain in his wrists.  Dr. Ebert recommended conservative measures because further surgery would cause functional impairment.  He prescribed Tylenol Number 3 for plaintiff to take when his pain was severe.  AR 443-44.

On September 20, 2006, plaintiff was seen in the emergency room for an exacerbation of his chronic obstructive pulmonary disease.  He reported that he had become acutely short of breath after burning wood without wearing a mask.  Plaintiff stated that he had been taking Advair but complained that his medications had been changed.  He believed that the medication change occurred because he did not have insurance.  The doctor treated him with prednisone.  AR 436-38.  A September 20, 2006 chest x-ray showed that plaintiff's lungs were well inflated and there was no acute cardiopulmonary change.  AR 369.  On October 25, 2006, Dr. Majd Kobitary reported that plaintiff's test results did not suggest pulmonary limitation and his symptoms were likely the result of deconditioning.  AR 434-35.

9

At a physical therapy appointment on June 1, 2007, plaintiff reported that he tried to stay active by walking and on good days, walks up to a mile. AR 420-21. On June 20, 2007, Dr. Chapman wrote a letter explaining plaintiff's conditions. She reported that he was status post bilateral wrist surgeries and was being treated with wrist braces and pain medication. She described plaintiff's lung function as moderate to severe. She wrote that although he was not oxygen dependent, he suffered from daily symptoms of shortness of breath. AR 367. X-rays taken on June 26, 2007 showed no evidence of acute cardiopulmonary disease. AR 368.

## C.  Consulting Physicians

On October 4, 2005, state agency physician Dar Muceno completed a physical residual functional capacity assessment for plaintiff, listing a diagnosis of chronic obstructive pulmonary disease. Dr. Muceno found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently and stand, walk or sit six hours in an eight-hour work day with no other limitations. AR 261-68.

On January 10, 2006, a second state agency physician, Dr. Pat Chan, completed a residual functional capacity assessment for plaintiff, finding that he had chronic obstructive pulmonary disease, wrist weakness and back and knee pain. Dr. Chan found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand, walk or sit six hours in

10

an eight-hour work day; and should avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases and poor ventilation. AR 337-44.

On January 12, 2006, state agency psychologist Keith Bauer completed a Psychiatric Review Technique Form for plaintiff and found no severe mental impairments. AR 345-58. He found that plaintiff had no difficulties in the activities of daily living, maintaining social functioning or maintaining concentration, persistence or pace and had no episodes of decompensation. AR 355.

## D. Hearing Testimony

Plaintiff testified that he was divorced and had adult children. AR 53. He testified that earlier in the summer, he had requested an expedited hearing in this matter because he was facing foreclosure on his home. Plaintiff explained that he had no income. AR 44. Plaintiff testified that he had last worked as a maintenance man for two years at the Eagle Ridge Inn but that he was fired from this job in September 2004 when he failed to call his employer to report that he could not come to work because he was incarcerated on a driving under the influence charge. AR 45-6. Plaintiff further testified that he had past work experience as a carpenter, construction worker and machinist. AR 48-51.

Plaintiff testified that he could not work because he had pain in his wrists and difficulty breathing. AR 55. He testified that he wore braces on both wrists and had trouble

11

lifting things with both hands.  AR 56-7.  He further testified that he took Gabenton and Vicodin for wrist pain.  AR 61.

Plaintiff testified that he became short of breath if he twisted from side-to-side, lifted anything heavy or walked more than 200 feet.  He explained that his shortness of breath was worse now than it was two years ago.  AR 58.  Plaintiff testified that he got dizzy when he stood in one place for very long or climbed stairs.  AR 60-1.  He testified that he had to pace himself when he was washing windows or vacuuming.  AR 64-5.  Plaintiff stated that he was taking Advair, Spiriva and Albuterol for his breathing problems.  AR 60.

The administrative law judge called Michelle Albers to testify as a neutral vocational expert.  AR 65.  Albers testified that plaintiff had performed his past work at the medium or heavy exertional level.  AR 66-7.  She further testified that the skills from plaintiff's carpenter job were not transferrable to other jobs at the light exertional level.  AR 67.

The administrative law judge asked Albers to consider an individual of plaintiff's age, educational background, work experience and the residual functional capacity to perform unskilled light work limited to occasional handling and occasional fine manipulation; no exposure to concentrated dust, fumes, smoke, chemicals or noxious gases; and no work at unprotected heights or around dangerous machinery.  Albers responded that such an individual could drive a tractor with those limitations.  When the administrative law judge asked Albers whether tractor driving would be impeded by the handling and manipulation

limitations, she stated:  "Handling would be handling objects like in assembly positions, handling different types of objects, you know, picking them up and moving them and driving requires gross dexterity and manual manipulation."  AR 67.

In a second hypothetical, the administrative law judge asked the expert to assume the individual was precluded from handling, fine manipulation or gross manipulation on an occasional basis.  Albers responded that such a person would not be able to perform plaintiff's past work but would be able to perform jobs existing in Wisconsin as a light delivery driver (15,000 jobs), courier (2,000 jobs), information clerk (1,000 jobs), counter clerk (2,000 jobs) and security monitor (2,000 jobs).  She explained that positions as a delivery driver or courier would be appropriate because they require only intermittent handling and gross manipulation.  AR 67-9.  The administrative law judge asked Albers whether her testimony differed from the information in the <u>Dictionary of Occupational Titles</u>.  She responded no.  Albers was not asked for citations to the <u>Dictionary</u> and did not provide any.  AR 69.

On cross examination, plaintiff's attorney asked Albers whether her response would change if the second hypothetical were further limited so that the individual could rarely do handling, fine manipulation or gross manipulation.  Albers responded that those limitations would preclude a person from performing all of the jobs that she had identified.  AR 70.

E.  <u>The Administrative Law Judge's Decision</u>

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. At step one, he found that plaintiff had not engaged in substantial gainful activity since September 30, 2004, his alleged onset date.  AR 18.  At step two, he found that a plaintiff had severe impairments of chronic obstructive pulmonary disease, arthritic changes in the hands, status post carpectomy surgeries and carpal tunnel syndrome.  The administrative law judge noted that although he questioned whether plaintiff's pulmonary disease met the 12-month durational requirement, he found it to be a severe impairment because the state agency physicians had limited plaintiff to light work in October 2005 and January 2006.  AR 20.  At step three, the administrative law judge found that plaintiff did not have a physical impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  AR 21.

At step four, the administrative law judge determined that plaintiff had the residual functional capacity to perform a range of light work limited to lifting no more than ten pounds frequently or 20 pounds total, occasional handling and fine or gross manipulation, no exposure to concentrated levels of dust, fumes, smoke, chemicals or noxious gases and no work at unprotected heights or around dangerous machinery.  AR 21.  Also at step four, the

14

administrative law judge found that plaintiff was not able to perform his past work, which he performed at a medium or heavy exertional level.  AR 24.

At step five, the administrative law judge found that if plaintiff had the residual functional capacity to perform the full range of light work before August 29, 2007 (his fifty-fifth birthday), he would be "not disabled" pursuant to Medical Vocational Rule 202.14. Because plaintiff had additional limitations, the administrative law judge called a vocational expert to determine the extent to which these limitations eroded the unskilled, light occupational base.  The expert testified that plaintiff still could perform jobs existing in Wisconsin as a light delivery driver (15,000 jobs), courier (2,000 jobs), information clerk (1,000 jobs), counter clerk (2,000 jobs) and security monitor (2,000 jobs).   The administrative law judge found the testimony was consistent with the information contained in the Dictionary of Occupational Titles.

Relying on the testimony of the expert, the administrative law judge found that prior to August 29, 2007, plaintiff was not disabled because there were significant jobs available in the national economy that he could perform.  The administrative law judge also found that beginning on August 29, 2007, plaintiff was disabled because there were not a significant number of jobs available in the national economy that he could perform.  Because plaintiff had last been insured as of December 31, 2006, he was not entitled to disability

insurance benefits.  However, he became eligible for supplemental security income as of August 29, 2007 the date he became disabled.  AR 25-6.

OPINION

A.  Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge.  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the

16

administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

### B.  Treating Physician Opinion

#### 1.  Pulmonary disorder

Plaintiff contends that the administrative law judge weighed the opinions of Dr. Chapman improperly by ignoring findings of a significant pulmonary disorder, mischaracterizing plaintiff's pulmonary difficulties as deconditioning and failing to recognize his inability to stand or walk for six hours in an eight-hour workday.  Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions.  Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005).  "[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."  Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006).  When a treating physician's opinion is well supported and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion.  Id.; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When, however, the record contains well-supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation.  Id.  These factors include how often the treating physician

17

has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, how consistent the physician's opinion is with the evidence as a whole and other factors.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion.  Id.

After concluding that plaintiff was severely impaired by a pulmonary disorder and considering the entire record, including Dr. Chapman's opinions and plaintiff's subjective complaints, the administrative law judge determined that plaintiff could perform a limited range of unskilled light work.  In making this determination, he discounted the severity of limitations assessed by Dr. Chapman and relied on the state agency physicians' opinions that plaintiff could perform light work.

As an initial matter, I note that plaintiff criticizes the administrative law judge for relying on the October 4, 2005 state agency opinion because Dr. Muceno did not have all the evidence of record before him.  However, the administrative law judge also had the January 2006 opinion of Dr. Chan, who limited plaintiff to no exposure to extreme cold, humidity and fumes, odors, dusts, gases and poor ventilation.  For the reasons discussed below, the administrative law judge determined that subsequent evidence did not show that plaintiff's condition worsened significantly after January 2006.

The administrative law judge gave good reasons for rejecting Dr. Chapman's opinions. He found no support for her November 2005 opinion in the treatment notes and clinical

18

testing of her colleagues at the Veterans Administration Hospital and Clinics and treatment notes from other providers showing that in November 2005 plaintiff had unremarkable blood oxygen levels and good ventilation without wheezing or rales. At that time, plaintiff also completed a six-minute walking test with a 91 percent or higher oxygen threshold.

Plaintiff argues that on November 1, 2005, Dr. Teelin wrote that plaintiff had significant chronic obstructive pulmonary disease and prescribed Advair, which plaintiff alleges he could not afford because of lack of insurance. Reviewing the treatment notes cited by plaintiff, I find no indication that the administrative law judge ignored any contradictory evidence. Although Dr. Teelin described plaintiff's disease as significant, he reported that his six-minute walking test was unremarkable, he was breathing comfortably, his disease was responsive to bronchodilators and he had recently been applying gutters to his home. On November 22, 2005, Dr. Chapman reported that plaintiff was doing well on Advair and had been chopping wood. Although plaintiff eventually had to stop taking Advair for period of time for lack of insurance coverage, he remained on other medication. Plaintiff testified that as the date of the hearing, he was taking Advair. As noted by the administrative law judge, medical records showed that plaintiff's health remained fairly stable after 2005.

Plaintiff criticizes the adjudicator's reliance on his March 2006 pulmonary function studies because deconditioning was cited as only a possible factor. The administrative law judge pointed out that a September 20, 2006 chest x-ray showed that plaintiff's lungs were

19

well inflated and showed no acute cardiopulmonary change.  On October 25, 2006, Dr. Majd Kobitary reported that plaintiff's test results did not suggest pulmonary limitation and his symptoms were likely the result of deconditioning.  Even Dr. Chapman noted in June 20, 2007 that plaintiff was not oxygen dependent.  Moreover, even with shortness of breath, plaintiff remained active, chopping wood, moving logs and walking up to a mile.

Apart from plaintiff's subjective complaints, no evidence in the record shows that plaintiff could not walk or stand up to six hours a day.  Although Dr. Chapman stated that plaintiff needed to take unscheduled breaks and be absent more than four days a month, she did not assess any standing, walking or lifting limitations for plaintiff.  Again, plaintiff's activities are not consistent with severe walking or standing limitations.  As late as June 1, 2007, plaintiff reported that he tried to stay active by walking and on good days, walked up to a mile.

Finally, plaintiff contends that the administrative law judge should have called a pulmonary expert to interpret the evidence in the record instead of reaching his own conclusions with respect to the medical evidence.  When, as here, a plaintiff is represented by an attorney, the administrative law judge is entitled to assume that the attorney will make a request for a consultative expert if he or she deems it important.  Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987) (administrative law judge can assume that applicant represented by counsel is "making his strongest case for benefits").

20

Further, the commissioner notes correctly that the administrative law judge must consult a medical expert only if he concludes that the evidence before him is insufficient to make a determination. 20 C.F.R. §§ 404.1527(f)(2)(iii); 416.927(f)(2)(iii) (administrative law judge may ask for opinion from medical expert on nature and severity of impairment and on whether impairment equals listed impairment).

The alleged errors cited by plaintiff amount to little more than nitpicking.  Although plaintiff disagrees with the administrative law judge's interpretation of the medical evidence, he fails to identify any specific medical "findings of a significant pulmonary disorder" that the administrative law judge failed to consider.  In my opinion, the administrative law judge provided good reasons supported by substantial evidence for discounting Dr. Chapman's opinion that plaintiff had a profoundly disabling pulmonary disease with frequently incapacitating attacks.  Because there was sufficient evidence in the record from which the administrative law judge could determine plaintiff's residual functional capacity, it was unnecessary for him to order a consultative examination.

2.  Hand and wrist limitations

Plaintiff asserts that the administrative law judge improperly discounted the severity of his bilateral wrist arthritis.  No physician placed any work limitations on plaintiff because of his wrist pain.  In June 2007, Dr. Chapman stated only that plaintiff had daily wrist pain

following his wrist surgeries and was being treated with braces and pain medication.  The administrative law judge accounted for plaintiff's wrist problems by limiting him to no more than handling, fine manipulation or gross manipulation on no more than an occasional basis. This finding was supported by substantial evidence in the record.

Treatment notes from November 22, 2005, January 24, 2006 and February 23, 2006 indicate that plaintiff had normal strength, sensation and range of motion in his wrists.  In fact, his wrist pain was controlled by Tylenol Arthritis until June 27, 2006, when Dr. Ebert prescribed Tylenol Number 3 for instances of severe pain.  The administrative law judge acted improperly in rejecting the opinion of plaintiff's treating physician regarding his wrist pain.  To the extent that plaintiff's arguments relate to the administrative law judge's credibility determination, I will address them in the following section of this opinion.

C.  Credibility

Plaintiff challenges the administrative law judge's determination that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:  1) determine whether an "underlying medically determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and 2) if

such a determination is made, evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  Social Security Ruling 96-7p, 1996 WL 374186, *1 (1996); see also Scheck, 357 F.3d at 702.   When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding his symptoms on the sole ground that the statements are not substantiated by objective medical evidence. Instead, the administrative law judge must consider the entire case record to determine whether the individual's statements are credible.  Relevant factors the administrative law judge must evaluate are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions.  SSR 96-7p; 20 C.F.R. §§ 404.1529(c), 416.929(c).  See also Scheck, 357 F.3d at 703; Zurawski, 245 F.3d at 887.

An administrative law judge's credibility determination is given special deference because the administrative law judge is in the best position to see and hear the witness and to determine credibility.  Shramek v. Apfel, 226 F.3d 809, 812 (7th Cir. 2000).  In general,

an administrative law judge's credibility determination will be upheld unless it is "patently wrong." Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006); Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."). However, the administrative law judge still must build an accurate and logical bridge between the evidence and the result. Shramek, 226 F.3d at 811. The court will affirm a credibility determination as long as the administrative law judge gives specific reasons that are supported by the record. Skarbeck v. Barnhart, 390 F. 3d 500, 505 (7th Cir. 2004).

Contrary to plaintiff's assertions, the administrative law judge properly considered the objective medical evidence and the other relevant factors listed in the regulation in making his credibility determination. He found that plaintiff's allegations regarding his pulmonary issues dating back to September 20, 2004 were particularly unconvincing because the record did not show that plaintiff received treatment until April 18, 2005, at which point he improved quickly. Although plaintiff's May 2005 chest x-rays suggested moderate obstructive disease, x-rays taken in January 2006 showed that an opacity at the lung base had cleared up and x-rays taken on January 26, 2007 showed no evidence of pneumonia or acute cardiopulmonary disease. The administrative law judge found that plaintiff's November 2005 allegation that he had difficulty walking into the clinic was inconsistent with his ability to perform a six-minute walking test at the time. He noted that the most

24

recent pulmonary studies suggested deconditioning rather than ventilatory or pulmonary disease.

The administrative law judge also concluded that plaintiff's allegations concerning his wrist limitations were not supported by the objective medical evidence.  In support, he noted that the physical examinations of plaintiff's hands were normal and the record contained no evidence of a neurological disorder.  Although plaintiff received a tentative diagnosis of carpal tunnel syndrome on January 10, 2006, the administrative law judge noted that by June 27, 2006, plaintiff did not have any deformities and only minimal tenderness.  He also pointed out that plaintiff had only mild to moderate arthritic changes in his wrists in late 2005 and early 2006, when he was cutting wood and lifting logs.

The administrative law judge considered plaintiff's activities, noting that several years after the alleged onset of his disability, plaintiff reported chopping and burning wood and moving logs.  He also noted that in 2007, plaintiff stated that he could walk up to a mile on a good day.  Plaintiff's own testimony that he could vacuum and wash windows if he paced himself also supports the administrative law judge's conclusion that he could perform a limited range of light work.

The administrative law judge found plaintiff's work record extremely uneven, with an extended period of little or no activity during the time when he allegedly was not disabled. He noted that plaintiff had lost his last job because he had failed to call in when he was

25

incarcerated, not because of his medical impairments.  The administrative law judge also pointed out that even though plaintiff reported improved breathing, minimal coughing and only slight shortness of breath to his doctor on April 22, 2005, he inquired about work excuses and disability, indicating that he had a secondary gain motive.

The administrative law judge's findings were well founded and supported by substantial evidence.  His credibility determination is not patently wrong.  He built an accurate and logical bridge from the evidence to his conclusion that plaintiff's testimony concerning his symptoms was not entirely credible.

In sum, the administrative law judge's conclusion at step four that plaintiff could perform light work limited to no more than occasional handling and occasional fine or gross manipulation and no exposure to dust, fumes, smoke, chemicals or noxious gases, unprotected heights or dangerous machinery is supported by substantial evidence.  The administrative law judge acted appropriately in including all of these limitations in the hypothetical posed to the vocational expert.  Because the administrative law judge did not err by failing to incorporate all of plaintiff's other alleged limitations in the hypothetical, he was entitled to rely on the expert's testimony.

D.  Step Five

The commissioner can meet his burden at step five by relying on information contained in the Dictionary of Occupational Titles, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs.  Social Security Ruling 00-4p; see also 20 C.F.R. §§ 404.1566(d)(1) and 416.966(d)(1) (Social Security Administration has taken administrative notice of the Dictionary).  Alternatively, the administrative law judge can rely on testimony from the vocational expert.  20 C.F.R. §§ 404.1366(e) and 416.966(e); SSR 00-4p.  When, as in this case, an administrative law judge takes testimony from a vocational expert about the requirements of a particular job, he has an affirmative responsibility to ask whether that testimony conflicts with the Dictionary.  SSR 00-4p.  If there is an *apparent* unresolved conflict, the administrative law judge must obtain a reasonable explanation from the expert for the conflict.  Id.; Overman v. Astrue, 2008 WL 4472095, *5 (7th Cir. Oct. 7, 2008); Prochaska, 454 F.3d at 735.  Although plaintiff agrees that the administrative law judge asked the vocational expert whether her testimony conflicted with the Dictionary, he asserts that if the adjudicator had researched the jobs identified by the expert, he would have found conflicts with the Dictionary.

At the hearing, the vocational expert testified that a person of plaintiff's age, education and residual functional capacity could perform 15,000 light delivery jobs, 2,000 light courier jobs, 1,000 light information clerk jobs, 2,000 light counter jobs and 2,000 light

27

security monitor jobs.  Plaintiff cites five specific <u>Dictionary</u> titles that he asserts coincide with the jobs the expert cited:  information clerk; salesperson, parts; surveillance-system monitor (government service); deliverer, outside; and route-delivery clerk.  Dkt. #8 at 20. Plaintiff asserts that those jobs are inconsistent with his residual functional capacity assessment because they require handling, semiskilled or skilled work and in some cases, exposure to odors and environmental conditions.  <u>Id.</u> at 19-20.  However, plaintiff has not shown that these are the specific titles to which the expert was citing.  No one at the hearing asked Albers for citations to the <u>Dictionary</u> and she did not provide any.

Although plaintiff's attorney had the opportunity to cross examine Albers about the consistency of her testimony with the <u>Dictionary</u>, he did not do so.  His failure "to identify the conflicts at the time of the hearing is not without consequence."  <u>Overman</u>, 2008 WL 4472095, at *6.  At thos satge of the proceedings, plaintiff must show that "the conflicts were obvious enough that the ALJ should have picked up on them without any assistance." <u>Id.</u>  Plaintiff argues that the jobs identified by the expert "seem to logically and intrinsically require extensive fingering and handling."  Dkt. #8, at 19.  I disagree.  Unlike in <u>Overman</u>, where cross examination of the vocational expert should have alerted the adjudicator to possible discrepancies between the expert's testimony and the <u>Dictionary</u>, there were no obvious conflicts in this case that the administrative law judge failed to address.

28

In response to the first hypothetical, which limited the person to occasional handling and occasional fine manipulation, the vocational expert stated that such a person would be able to perform plaintiff's past work as a tractor driver.  Reasoning that handling and manipulation limitations could impede a person's ability to drive, the administrative law judge questioned Albers about this concern.  Albers explained that driving requires gross dexterity and manual manipulation and not handling, which is the ability to pick up or move different types of objects, such as in assembly occupations.  The administrative law judge then added to his hypothetical that the individual would be precluded from more than occasional handling, fine manipulation or gross manipulation.  Albers responded that such a person would be able to work as a light delivery driver, courier, information clerk, counter clerk and security monitor.  She went on to explain that positions as a delivery driver or courier would be appropriate because they require only intermittent handling and gross manipulation.  Plaintiff's attorney did not cross examine Albers on this issue.  Further, given the way in which the vocational expert explained handling and manipulation, it is not obvious that an information or counter clerk or a security monitor would have to perform these functions on more than an occasional basis.

Although I agree that it would be helpful if administrative law judges required vocational experts to support their testimony with specific citations from the Dictionary, SSR 00-4p does not require administrative law judges to take that step.  The ruling

29

reasonably allows administrative law judges to assume that a vocational expert who swears under oath that her testimony is consistent with the <u>Dictionary</u> is telling the truth, requiring further inquiry only if the expert says that her testimony is *not* consistent with the <u>Dictionary</u> or if the conflict is so obvious as to alert the administrative law judge.  At least in cases in which the claimant is represented by a lawyer, there is little that is unfair about this procedure.  In spite of the non-adversarial nature of social security hearings, it remains the case that a vocational expert is "free to give a bottom line, provided that the underlying data and reasoning are available on demand."  <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446 (7th Cir. 2002).  A lawyer who wants to cross-check the job titles cited by a vocational expert against the descriptions set forth in the <u>Dictionary</u> is free to ask the expert to provide the relevant <u>Dictionary</u> citations; if the expert refuses to provide this information, the result is likely to be a remand.  <u>Accord</u> <u>McKinnie v. Barnhart</u>, 368 F.3d 907, 911 (7th Cir. 2004) (data underlying vocational expert's testimony were not "available on demand" where vocational expert testified that her figures were based on government statistics and her own surveys but had not prepared a written report, did not bring any reference materials to hearing and could not provide citations to materials on which she relied and administrative law judge told claimant's attorney that expert could refuse to compile her data and references unless claimant compensated her for her time). A lawyer who does not have adequate time to consult the <u>Dictionary</u> on the spot can ask for a brief recess or for time to supplement the

record after the hearing.  Britton v. Astrue, 521 F.3d 799, 804 (7th Cir. 2008) (suggesting ways to balance "the needs of the claimant to effectively cross-examine the VE and the needs of the Commissioner to hold efficient hearings").

In any event, I note that this does not appear to be a case in which a miscarriage of justice will result if the vocational expert's testimony is allowed to stand.  A brief search of the Dictionary reveals that there are job titles within the broad categories identified by the vocational expert that involve unskilled work (specific vocational preparation level two) at a sedentary or light exertional level, require no handling or fingering and have no exposure to chemicals or other atmospheric or environmental conditions:   counter clerk (DOT 249.366-010); surveillance system monitor (DOT 379.367-010); and information clerk (DOT 237.367-018) (handling ranges from occasional to frequent in these positions). Although the vocational expert was not asked to cite examples from the Dictionary, it is reasonable to assume that these were the types of jobs to which she was referring in her testimony.

In sum, because there was no apparent conflict between the expert's testimony and the Dictionary, the administrative law judge did not have any affirmative duty to resolve it. I am satisfied that the administrative law judge met his responsibility under SSR 00-4p and properly relied on the vocational expert's testimony.

31

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of

Social Security, is AFFIRMED and plaintiff Frederick E. Hofer's appeal is DISMISSED.

The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 17th day of November, 2008.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

32